**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re : Chapter 11

THOMAS L. RIPLEY, SR., :

Debtor. : Case No. 08-12390 (JKF)

_____

## MEMORANDUM OPINION

BY: JEAN K. FITZSIMON
United States Bankruptcy Judge

This matter is before the Court on Bank of America's Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d)(2) (the "Motion" or "Motion for Relief"). An evidentiary hearing was held on August 13, 14, and 18, 2008, the "August Hearing") and this matter is now ripe for adjudication. Upon consideration of the testimony and evidence presented at the August Hearing, as well as an examination of the relevant law, the Court concludes that while the Debtor lacks equity in his property, this property is necessary for a reorganization under Chapter 11 of the Bankruptcy Code. Therefore, for reasons more fully discussed below, the Motion is denied.

# I.  BACKGROUND

### *The Bankruptcy Filing*

Thomas L. Ripley, Sr. ("Mr. Ripley" or the "Debtor") filed for Chapter 13 bankruptcy protection in this Court on April 10, 2008.[1]  On July 16, 2008, Mr. Ripley's case was converted to Chapter 11 of the Bankruptcy Code.  The Debtor's Schedule A lists ownership of one piece of real property located at 3535 Bristol Road in Doylestown, Pennsylvania (the "Property").  Docket entry no. 19.  The value of the Property is listed at $3,220.000.  Id.  Amended Schedule D lists four secured claims on the Property: 1) a first mortgage lien in the amount of $1,781,229 owed to Bank of America; 2) a second mortgage lien in the amount of $531,406 owed to Madison Bank, Division of Leesport Bank ("Madison Bank"); 3) a third mortgage lien in the amount of $1,200,000 owed to The Ohio Casualty Insurance Company ("Ohio Casualty"); and 4) 2006 real estate taxes in the amount of $5,963 owed to Bucks County Tax Claim Bureau (the "Real Estate Taxes").  Docket entry no. 64.

Stephen and Lisa Cataldo are listed on Schedule H as codebtors with regard to the loans to Ohio Casualty and Madison Bank (as well as two other

---

[1]  This is Mr. Ripley's second bankruptcy petition.  His first petition (case number 08-10999) was filed in this Court on February 8, 2008 and dismissed on April 1. 2008 for failure to obtain credit counseling prepetition or to satisfy the legal requirements of demonstrating "exigent circumstances" which would excuse his prepetition noncompliance.  See docket no. 38.

debts).  Docket entry no. 19.  According to Schedules I and J, Mr. Ripley and his wife have a combined monthly income of $2,815 (she works as an office assistant and he as a groundskeeper) and average monthly expenses of $2,988.

On April 17, 2008, Bank of America ("BOA" or the "Bank") filed a Motion for Relief from the Automatic Stay.  Docket entry no. 13.  The Motion for Relief asks the Court to lift the stay on the four contiguous parcels of land which have the address of 3535 Bristol Road (previously defined as the "Property") pursuant to section 362(d) of the Bankruptcy Code.[2]  Mr. Ripley filed an Objection to the Motion for Relief on July 22, 2008 (the "Objection").  Docket entry no. 56.  The Objection asserts that, because the Property is valued at $3,220,000 and BOA's secured claims total $2,000,000, there is equity in the Property and the stay should not be lifted.  The Debtor's Objection further asserts that BOA and Mr. Ripley reached a stipulation which resolved the Motion.  However, when the parties appeared before the Court of August 13, 2008, the Bank reported that no such agreement was pending between the parties and that it wished to proceed with the Motion for Relief.

Ohio Casualty, which is a junior secured creditor and owed $1,200,000 by the Debtor, also filed a Response to the Motion for Relief.  Docket entry no. 29.

---

[2]  Mr. Ripley resides on Parcel number 9733 of the Property.  See the Objection to the Motion for Relief at 1.

3

Ohio Casualty, like the Debtor, asserts that there "may be substantial equity in the Debtor's real estate over and above BOA's secured claims."  (Ohio Casualty Response, pg. 2.)

### The August Hearing

During the three day August Hearing, Mr. Ripley and the Bank each had the opportunity to present evidence and examine witnesses concerning the value and use of the Property.  After considering the pleadings, the exhibits, and the in-court testimony, the Court makes the following findings of fact in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Liens on the Property

At the August Hearing, it was established that the following mortgages are owed on the Property:

1.  A $950,000 loan from BOA secured by a first mortgage on parcel numbers 9731, 9732 and 9739 of the Property (the "$950,000 Loan").  <u>See</u> BOA Exhibits one and two.[3]  On December 30, 2005, Bank of America confessed judgment against the Debtor in the Court of Common Pleas in Bucks County, Pennsylvania on the $950,000 Loan in the total amount of $1,096,838.  BOA

---

[3]  All Exhibits were entered into evidence at the conclusion of the August Hearing.

Exhibit 7.  As of August 12, 2008, the payoff amount of the $950,000 Loan was

$1,306,483.  BOA Exhibit 9.  Mr. Ripley has not made a payment on this loan in

over three years.

2.  A $400,000 loan from BOA secured by a first mortgage on parcel

number 9733 of the Property (the "$400,000 Loan").  See BOA Exhibits 3 and 4.[4]

As of August 12, 2008, the payoff amount of the $400,000 Loan was $487,690.

BOA Exhibit 10.

3.  A mortgage on parcel numbers 9731 and 9732 of the Property in the

face amount of $500,000 recorded in September 2005 and owed to Madison

Bank.  See Motion for Relief, ¶ 21,a and the Debtor's Objection, ¶ 21,a.

4.  A mortgage on all four parcels of the Property in the face amount of

$1,200,000 recorded in February 2006 and owed to Ohio Casualty.  See Motion

for Relief, ¶ 21,b and the Debtor's Objection, ¶ 21,b.


***The Cataldo Property***

Both Ohio Casualty and Madison Bank's loans are cross collateralized on

the property of the Debtor's neighbors, Stephan A. and Lisa M. Cataldo, who own

a 12 acre piece of property next to the real estate owned by Mr. Ripley.  See

---

[4]  The Motion for Relief alleged that the Debtor borrowed an additional $200,000 from BOA.
See Motion, pg. 3.  However, the Bank was unable to prove at the August Hearing that payment
was due on this loan.  Therefore, the Court will not consider this alleged debt as a lien on the
Property.

Response of Ohio Casualty, pg. 2 (the "Cataldo Property").  In addition,

Mr. Cataldo owes Wachovia Bank $480,000, which is secured by a mortgage on

his property, and Mr. Stein (his real estate agent) approximately $200,000.

Wachovia was scheduled to foreclosure on Mr. Cataldo's property October 10,

2008.[5]  Mr. Cataldo testified that he has in the past and plans in the future to

market his property together with the Ripleys.  Mr. Cataldo and Mr. Ripley have

been friends and business partners for over 30 years.

In April 2006, the Cataldos and the Ripleys had a tentative agreement with

McKee Properties, Inc. ("McKee") to purchase both pieces of land.  The Ripleys'

Property was to be sold for $4,840,000 and the Cataldo Property for $1,660,000.

See Agreements of Sale, Debtor Exhibits 15 and 16.  According to Mr. Ripley's

testimony, these agreements with McKee, which would have allowed for a full

payoff of the Bank's claims at the closing, fell through because the Bank would

not allow the Ripleys to come current and pay the rest at the closing of the deal.


**The Appraisal Testimony**

William Bott, a professional real estate appraiser, testified for the Bank

that, as of his inspection on July 31, 2008, the Property is worth $1,835,000.  This

is the third time that Mr. Bott has appraised the Property.  He determined the

---

[5]  Mr. Cataldo testified that he has filed for Chapter 7 bankruptcy.

6

Property to be worth nearly three million dollars in late 2006 and $1,995,000 in

November of 2007.  The Property, according to Mr. Bott's appraisal report, is

improved with a single family dwelling, an apartment over the garage, a barn, and

miscellaneous "outbuildings."  See Exhibit BA 14, pg. V.  Mr. Bott considered

what the "highest and best use" of the Property is in calculating the value.

Mr. Bott performed an analysis of the flood plain and the lot width and determined

that there are seven lots for vacant land.  According to Mr. Bott, the Property

contains 27.4 acres of developable land, 9.5 of which are in a flood plain.

Currently, the Property is zoned as "R-IA, Residential," which requires a

two acre minimum lot size.  Each of the seven two acre plots are worth

approximately $155,000, according to Mr. Bott.[6]  Mr. Bott conceded that it would

be possible to obtain "cluster zoning" - which requires only a one acre minimum

lot size - on the Property, but noted that cluster zoning may mean that the each

plot of land is worth around 15-20% less than it would be otherwise.  In addition,

converting the Property to cluster zoning, according to the testimony of Mr. Bott,

would require both 45% more open land space and the extension of public water

and sewer lines.  These requirements would mean that the conversion from R-IA

---

[6]  Seven lots at $155,000 each equals $1,085,000.  The barn and additional "outbuildings" are
valued at a total of $750,000, bringing the total value of the Property to $1,835,000.  See
Exhibit BA 14, preface, pg. 3.

to cluster zoning, according to Mr. Bott, would produce only one additional lot of land and yet cost a great deal of additional time, money, and work.

Mr. Bott therefore said that he considers the R-IA zoning - maintaining the seven, two acre plots - to be the most profitable use of the Property because of the additional value of using the larger size lots and the efficiency of working with the land as it is, rather than assuming the costs and risks of additional water, sewer, and road projects.  See Exhibit BA 14 at pg.2 5 ("the . . . R-1A Zoning . . . would preserve the flood plain and other resource protected areas of the site . . . the subject may have the potential for one additional home site [under Cluster zoning], but with significantly higher development cost related to contracting for and extending public water and sewer to the site.").  Mr. Bott said that his estimates assume that the Property will take about a year to market and sell and that this is a reasonable "exposure time" in the market.[7]  Mr. Bott did concede that if the Debtor obtained approvals to subdivide the Property, the value of the Property would likely increase.  It is possible that these approvals could be obtained within a year.

Robert Showalter, an expert civil engineer with almost 40 years of experience, testified regarding both the use of the Property for the Debtor and

---

[7]  "Exposure time" is defined in Mr. Bott's appraisal report to mean "the length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective appraisal date . . ." Exhibit BOA 14, pg. 3.

how use of the land may ultimately be valued by a potential purchaser of the Property. Mr. Showalter is not an appraiser, though he has testified previously regarding property valuations. Mr. Showalter, who was initially hired on this project by Mr. Ripley and Mr. Cataldo three years ago, is familiar with the Property and its zoning. He has performed flood plain, wetland, impact, and traffic analyses, which he deems critical to determining the amount of land that is available for development. Mr. Showalter prepared plans in preparation for the McKee Agreement of Sale (which, as described above, ultimately fell through).

Mr. Showalter testified that the Property (not including the Cataldo Property) is worth approximately $4,000,000, or $2,860,000 when one deducts the necessary improvement and engineering costs.[8] The exhibit provided by Mr. Showalter shows $2,860,000 to be the "net value" of the Property. See Exhibit D9, pg. 2. The total figure of approximately four million is calculated in the following way (see Id.):

| Lot | Value | Notes |
|---|---|---|
| Historical Farm House | $650,000 | |
| Barn Lot | $450,000 | |

---

[8]   There will also be certain (unspecified) costs for obtaining approvals on the Property. However, Mr. Showalter testified that the costs of obtaining such approvals will be paid by any developer who purchases the Property.

9

| Nine Lots at $275,000 per lot | $2,250,000 | • This is the "Improved Lot Value"<br>• Mr. Showalter calculates 9 times $275,000 to be $2,250,000; the Court calculates it to be $2,475,000. |
|---|---|---|
| Two additional lots at $325,000 | $650,000 | |
| **TOTAL** | $4,000,000 | |

Mr. Showalter estimates that the total improvement and engineering costs would

be $1,140,000.  He arrives at this figure by calculating that each of the 13 lots

would cost approximately $80,000 to improve - for a total of $1,040,000 - and that

the engineering costs would be about $100,000.  See Exhibit D9 at pg. 2.

Mr. Showalter directed the Court to his current sketch plan, Exhibit D9,

which calls for the Property to be divided into 13 lots of at least one acre, allowing

for 45% of the land as open space under a B7 single-family cluster zoning.  Of

these 13 lots, 11 would be new lots, one lot would contain the existing historical

farmhouse and an area of 1.4 acres, and one lot would contain the existing

historical barn with an area of 1.68 acres.  See Exhibit D9 at pg. 1.  The other 11

lots would vary in size from one acre to 1.47 acres.  Id.  According to

Mr. Showalter, this design would have many benefits, including preserving the

Neshaminy stream and walking trail, which are important to the Township.  Also,

10

Mr. Showalter emphasized that the "D9 Plan," as he called it, is the simplest and

fastest one to accomplish because it will receive approval "by right," which means

that because it meets the requirements for zoning and construction, the D9 Plan

will necessarily receive zoning approval and there will be no need for additional

hearings, which would add time and potentially cost to the project.  Further, while

this analysis and pricing does not specifically take the Cataldo Property into

account, Mr. Showalter noted that this type of zoning and planning would work

well for the Cataldo Property.  Therefore, a buyer who is interested in purchasing

both the Ripleys' and the Cataldos' properties could incorporate the D9 Plan into

his or her purchase.[9]

Even though approvals with regard to the D9 plan are "by right," they still

need authority; the needed stamps of approval can take anywhere from six

months to a year and a half to obtain.  However, Mr. Showalter testified that the

necessary groundwork on this project has been done.  In addition, the Property is

far more valuable as an approved development plan than as a mere undeveloped

piece of land.

While Mr. Showalter did recommend the "D9 Plan" as the fastest and

simplest way of marketing and selling the Property, he also noted that a

---

[9]  Mr. Showalter noted that the Cataldo Property could potentially add additional lots to the
development and does not have the same resource restrictions as the Ripley property.

substantial amount of due diligence has been performed with regard to the "B15"

historical preservation cluster zoning option (the "B15 Option"), if a developer

should choose to go that route.  The B15 Option was initially developed for the

McKee Group.  It called for a development of townhouses and had the added

benefit of preserving a 500 or so year-old tree that is beloved by the Township.

Mr. Showalter offered that he considers the B15 Option ultimately to be the best

use of this Property.  However, the B15 Option does not have "by right" approval;

it is a conditional use approval, which requires additional hearings and thus would

cost additional time and possibly money to the project.


***The Liquidating Plan of Reorganization***

At the August Hearing, Mr. Ripley submitted for consideration a Liquidating

Plan of Reorganization (the "Plan").  <u>See</u> Exhibit D1.  Since the hearing, a plan

substantially similar to the one provided at the August Hearing has been filed in

Mr. Ripley's bankruptcy case.  Docket entry no. 65, filed September 3, 2008.  The

Plan calls for the sale of the Property to take place within one year from the date

of the filing of the Plan, and in no event later than September 1, 2009.  Exhibit D1

at pg. 16; docket no. 65 at pg. 15.  The Plan further provides:

> If the Debtor does not obtain a binding agreement of
> sale for the [Property] by July 16, 2009, the [Property]
> will immediately be listed with a real estate auctioneer

who will advertise and market the real estate for an
auction to take place no later than September 16, 2009.
If the Debtor obtains an agreement of sale for the
[Property] by July 16, 2009, but the buyer does not close
by September 1, 2009, the [Property] will immediately
be listed with an auctioneer as set forth above with the
auction to take place no later than sixty (60) days after
such listing.  If a sale is not consummated as outlined
above, the [Property] will be auctioned and all proceeds
will be used to satisfy the allowed claims.  To the extent
the auction does not yield enough money to satisfy all
claims in full, the creditors will share pro-rata in the
distribution.

Id.  The Debtor also filed a Disclosure Statement and Motion to Approve the

Disclosure Statement on September 3, 2008.  See docket entry nos. 66, 67,72,

and 73.

## II.  STANDARDS FOR LIFTING THE AUTOMATIC STAY

The automatic stay is "one of the fundamental debtor protections supplied

by the Bankruptcy Code."  In re Atlantic Med. Mgmt. Servs., Inc., 387 B.R. 654,

662 (Bankr. E.D. Pa. 2008) (citing University Medical Center v. Sullivan (In re

University Medical Center), 973 F.2d 1065, 1074 (3d Cir. 1992)).  See also In re

Ellis, 339 B.R. 136, 140 n.7 (Bankr. E.D. Pa. 2006) (noting that the automatic stay

gives the debtor "a breathing spell from his creditors by stopping all collection

efforts, all harassment and all foreclosure actions.  It permits the debtor to

attempt a repayment or reorganization plan or simply to be free of the financial

pressures that drove him into bankruptcy."). Specifically, Section 362(a)(3) of the Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Further, Section 362(a)(4) stays "any act to create, perfect, or enforce any lien against property of the estate."

A court may lift the automatic stay "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (2) with respect to a stay of an act against property under subsection (a) of this section, if-(A) the debtor does not have an equity in such property; *and* (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2) (emphasis added). Whether to terminate or modify the bankruptcy stay under section 362(d) is within the discretion of the bankruptcy court and is a determination made by examining the totality of the circumstances. In re Milstein, 304 B.R. 208, 211 (Bankr. E.D. Pa. 2004) (citations omitted). See also In re Rambo, 2004 WL 231011, at *2 (Bankr. E.D. Pa. Jan. 29, 2004). The party requesting relief from the automatic stay has the burden of proof with regard to the issue of the debtor's equity, and the party opposing such relief has the burden of proof that the property is necessary to an effective reorganization. Nazareth Nat'l Bank v. Trina-Dee, Inc., 731 F.2d 170, 171 (3d. Cir. 1984); 11 U.S.C. § 362(g)(1-2).

14

A debtor lacks equity in property for purposes of section 362(d)(2) when

"the debts secured by liens on the property exceed the value of the property."

3 *Collier on Bankruptcy*, ¶ 362.07[4][a] at 362-98 (15th ed. 2002).  In other words,

in making a determination on equity, a court "focuses on a comparison between

the *total* liens against the property and the property's current value . . . *all*

encumbrances are totaled to determine equity whether or not all lienholders have

requested relief from the stay."  In re Indian Palms Assoc., LTD., 61 F.3d 197 (3d

Cir. 1995) (emphasis added).  See also Sutton v. Bank One, Texas, N.A., 904

F.2d 327 (5th Cir. 1990);  Stewart v. Gurley, 745 F.2d 1994, 1195 (9th Cir.

1984).[10]

If the movant demonstrates that the debtor has no equity in the property,

then the debtor has the opportunity to prevent modification of the automatic stay

by showing the court that the property is necessary for an effective

reorganization.  See In re Epic Capital Corp., 290 B.R. 514, 520 (Bankr. D. Del.

2003).  The Supreme Court has outlined the standard necessary for

demonstrating whether property is necessary for an effective reorganization:

> What this requires is not merely a showing that if there
> is conceivably to be an effective reorganization, this
> property will be needed for it; but that the property is

---

[10]  The Bank was thus incorrect when it asserted at the August Hearing that the equity
determination in this matter should be made simply by comparing the current value of the
Property to the amount of BOA's lien on the Property.

15

> essential for an effective reorganization *that is in the
> prospect.* This means . . . that there must be "a
> reasonable possibility of a successful reorganization
> within a reasonable time."

United Savings Assoc. of Texas v. Timbers of Inwood Forest, 484 U.S. 365, 376-

77 (1988) (emphasis in original).  According to the Third Circuit, the debtor must

show that "a proposed or contemplated plan is not patently unconfirmable and

has a realistic chance of being confirmed."  John Hancock Mutual Life Ins. Co. v.

Route 37 Business Park Assoc., 987 F.2d 154, 157 (3d Cir. 1993).  As one court

noted "[w]hile the debtor need not demonstrate that substantial consummation of

its plan is guaranteed, a reasonable possibility of a successful reorganization

cannot be founded solely on speculation."  In re Dupell, 235 B.R. 783, 790 (E.D.

Pa. 1990) (citation omitted).  See also Laddeck v. Laddeck, 2001 WL 423026, at

*8 (Bankr. E.D. Pa. Apr. 11, 2001).  Proposed plans must be viable to be

confirmed in order to prevent the "confirmation of visionary schemes."  In re

American Sweeteners, Inc., 1999 WL 1068446, at *3 (Bankr. E.D. Pa. Nov. 22,

1999) (citing 5 *Collier on Bankruptcy*, ¶ 1129.02[11] at 1129-59 (15th ed. 1994)).

The question presented by the Bank's Motion is therefore twofold.  First,

does Mr. Ripley have equity in the Property?  Second, is the Property necessary

for an effective reorganization?  If the answer to either question is yes, the Motion

must be denied.  The questions will be taken in turn.

## III.  VALUATION

The first question can be answered in the negative.  The Court concludes

that - given the many secured creditors with claims against it - the Debtor does

not at this time have equity in the Property.  While the Court finds that making a

specific dollar valuation regarding the Property to be difficult, if not impossible, at

this point,[11] such a determination is also unnecessary, for the Debtor's calculation

of equity fails on its own merits.

As discussed above, in order to calculate a debtor's equity in his property,

a court must determine the current market value and then subtract *all*

encumbrances on the property (as opposed to just the lien the secured creditor

who holds a first mortgage).  See In re Indian Palms Assoc., LTD., 61 F.3d 197

(3d Cir. 1995).   In this case, the amount of secured debt on the Property totals

$3,531,542 (the "Total Secured Debt").[12]  Mr. Showalter - the Debtor's own

---

[11]  The value of the Property is a very difficult question, particularly where, as here, two skilled professionals have reached different conclusions regarding valuation. See, e.g. In re Prussia Assoc., 322 B.R. 572, 580 (Bankr. E.D. Pa. 2005) (quoting the "oft noted proposition that the appraisal of real estate is an inexact science.").

[12]  This figure is derived by adding the following amounts: the current payoff amounts on the $950,000 Loan and the $400,000 Loan, see Exhibits BOA 9 and BOA 10, ($1,306,483 and $487,690, respectively), plus the Real Estate Taxes of $5,963, plus the $531,406 owed to Madison, plus the $1,200,000 owed to Ohio Casualty.  See Amended Schedule D, docket no. 64.  Note that the amount found to be owed to the Bank at trial ($1,794,173: $1,306,483 owed on the $950 Loan plus $487,690 owed on the $400,000 Loan) is higher than the amount that the Debtor lists as a debt to the Bank on Amended Schedule D ($1,781,229) and thus the Court's calculation of the Total Secured Debt at $3,531,542 is higher than that asserted by the Debtor, which is $3,518,599.  See Amended Schedule D.

witness - testified that the Property would be worth $4,000,000 only after

$1,140,000 was spent on engineering and improving.  While Mr. Showalter

indicated at the August Hearing that the costs of improving the Property may be

paid by a developer rather than by the Debtor, both his testimony and his written

report make clear that the "net value" of the Property - i.e. the value of the

Property to the Debtor and his estate - is $2,860,000.  Exhibit D9, pg. 2.  In other

words, Mr. Showalter estimates that the current market value of the Property at

this time is $2,860,000, which is substantially less than the $3,531,542 the Debtor

currently owes on the Property.[13]  For this reason, the Court determines that

Mr. Ripley lacks equity in the Property.  See California Diesel & Equipment, Inc.

v. Sun Exploration and Production Co., 990 F.2d 1256, 1993 WL 77276 (9th Cir.

Mar. 18, 1993) (holding that costs to improve property were necessarily sellers

costs and would not be imposed on the buyer of property); In re River Valley

Fitness One Ltd. P'ship, 2006 WL 618442, at *15 (Bankr. D.N.H. Mar. 7, 2006)

(reducing valuation analysis by cost of improvements); In re Zeigler, 320 B.R.

362, 379 (Bankr. N.D. Ill. 2005) (same).

The Court must deduct the value of planned improvements and assess the

Property as is because "[p]roperty to be assessed, whatever may be its

---

[13]  There is no question that the Debtor lacks equity in the Property if one accepts the
conclusion of Mr. Bott, who testified that the Property is currently worth $1,835,000.  This figure
is far less than the $3,531,542 that the Debtor owes to his secured creditors.

character, is to be taken and valued in the actual condition in which the owner

holds it." In re Mocco, 222 B.R. 440, 462 (Bankr. D.N.J. 1998) (citations omitted).

Mr. Schowalter's figure of $2,860,000 - the value of the Property without

improvements - simply does not come close to giving Mr. Ripley equity in the

Property, given that he owes his secured creditors $3,531,542 at this time.  The

Court therefore finds that the Debtor lacks equity in the Property.  Part two of the

test for whether to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(2) must

therefore be examined.


## IV.  REORGANIZATION

Despite the Court's conclusion that Mr. Ripley lacks equity in the Property, the

stay will not be lifted at this early stage in the Debtor's bankruptcy because the

Property is necessary for an effective reorganization pursuant to 11 U.S.C.

§ 362(d)(2).  Mr. Ripley presented at the August Hearing, and has since filed,

what this Court considers to be a potentially viable bankruptcy plan (the "Plan").

The Plan, as more fully detailed above (see Section I, pg.12-13) calls for selling

the Property and distributing the proceeds to the secured creditors.  The Plan

calls for obtaining a binding agreement of sale on the Property by July 16, 2009.

As a preliminary matter, it is clear that the Property is necessary to effectuate the

Plan; the Property is Mr. Ripley's sole valuable asset and the one which is

secured by his four primary creditors.  See In re Indian Palms Assoc., LTD., 61

F.3d 197, 209 (3d Cir. 1995) ("[i]n a single asset bankruptcy case . . . the property

will almost always be necessary for reorganization for the very reason that it is

the debtor's sole asset, and relief under 362(d)(2)(B) will be available only if the

bankruptcy court concludes that reorganization within a reasonable time is not

feasible").

Thus, the question becomes whether the Plan is viable.  The Bank

contends that the Plan and this case are "going nowhere" and should be cut off

sooner rather than later in order to pay the secured creditors in the most timely

way possible.  Mr. Ripley, on the other hand, argues that he is on the cusp of

getting necessary building approvals for the Property.  When these are obtained,

the Debtor asserts, the value of the Property will increase greatly.  Thus,

according to the Debtor, there is a benefit to selling the Property in an organized,

timely way and marketing it carefully, rather than selling the land in a rushed

manner out of bankruptcy.  The former, contends Mr. Ripley, will create more

value for secured creditors and means that the Plan is confirmable.

Here, the Court agrees with the Debtor.  The Plan appears at this early

stage to be viable.  If there is one thing that everyone agreed on at the August

Hearing it is that the Property is in a desirable, central location and that the land

can and will ultimately be developed.  See Appraisal Report of Mr. Bott, Exhibit

BA 14, at pg. 7 ("the subject is located in one of Philadelphia's most desirable

suburban communities.  Its proximity to regional highways and employment

centers, residential amenities, and highly regarded public school system have

made and should continue to make Doylestown Township a premier residential

market.").  Thus, there seems to be no reason to rush to sell the Property,

particularly in the current volatile real estate market.[14]  The Debtor and

Mr. Showalter have done a great deal of work researching and planning how best

to develop the Property.  It would be a waste not to see that labor come to fruition

by allowing these parties to attempt to market this Property in the way that they

deem to be most fitting and profitable.  Lifting the stay at this point could

potentially eradicate much of the work that has been done with regard to the

development of the Property up to now.

    In fact, Ohio Casualty, which is owed $1.2 million by the Debtor and is third

in line to get paid (behind BOA and Madison), argues that, at a minimum, there

will be equity in the Property by the time the Debtor intends to sell it in a year and,

therefore, that Mr. Ripley should be given a chance to reorganize.  <u>See</u> Response

to the Motion for Relief, docket entry no. 29.  (Counsel for Ohio Casualty also

appeared at the August Hearing to argue against lifting the automatic stay.)  In

---

[14]  Due to the current downturn in the real estate market, lifting the stay at this point could
provide the Bank with the windfall if it were to purchase the Property now at a discount and sell
it in a year or so at a significant profit.

other words, one of the Debtor's secured creditors is expending significant funds to stave off stay relief and allow the Debtor to market the Property because it believes it will be worth more if the Debtor is allowed to complete his development and marketing plans for this land.  And, as Ohio Casualty's Response point's out, because Ohio Casualty and Madison Bank's mortgages are cross-collateralized on the Cataldo Property, "Mr. Ripley and Mr. Cataldo may intend to coordinate the sales of their respective contiguous properties in order to maximize the development potential thereof." (Ohio Casualty Response, ¶ 7).  As previously discussed, such a plan could well also add to the value of the Property.

In addition, the Debtor's Plan calls for the Property to be marketed and sold within less than a year.  The Plan lays out specific contingency arrangements for what will happen if an agreement of sale is not signed by July 16, 2009.  This, the Court finds, means that there is "a reasonable possibility of a successful reorganization within a reasonable time."  United Savings Assoc. of Texas v. Timbers of Inwood Forest, 484 U.S. 365, 376 (1988).  The Debtor has satisfied the Court that  "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed."  John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assoc., 987 F.2d 154, 157 (3d Cir. 1993).

The Court's reluctance to lifting the stay also stems from the fact that

Mr. Ripley's case was filed about six months ago and he was able to retain

counsel just four months ago.  <u>See</u> docket entry no. 37.  It is simply too soon to

declare that the Debtor has no chance of proceeding successfully with his

bankruptcy remedies and that BOA should therefore be allowed to pursue its

rights in state court.  <u>See</u> <u>In re Dupell</u>, 235 B.R. 783, 795 (Bankr. E.D. Pa. 1999)

("[a] bankruptcy court should be reluctant to deprive a debtor of the benefits of

Chapter 11 relief before it has an adequate opportunity to utilize its rehabilitative

features"); <u>In re American Sweeteners, Inc.</u>, 1999 WL 1068446, at *3 (Bankr.

E.D. Pa. Nov. 22, 1999) (same).  Further, it is unlikely, or at least unclear, that the

Bank would receive payment on its debt any faster if the stay were lifted.  Mr. Bott

testified for the Bank that it would take a year to market and sell the Property.

Similarly, the Plan proposed by the Debtor calls for there to be an agreement of

sale in place by July 2009.  In either case, the Bank would not receive payment

until at least next summer.  Thus, not only is it premature at this point to lift the

stay, but it does not appear that doing so would have the intended effect of

getting the movant more immediate payment on its secured debt.

The Bank also erroneously assumes that the Debtor's lack of equity in the

Property necessarily means that his Plan is not feasible.  This is not so for at

least three reasons.  First, if lack of equity meant that a plan of reorganization

would necessary fail, the test outlined in 11 U.S.C. § 362(d) would not be a two-part test.  Second, other courts have denied a motion to lift the stay under similar factual circumstances, holding that a debtor who lacks equity in property may still need the property for an effective reorganization.  See, e.g., In re Epic Capital Corp., 290 B.R. 514, 520 (Bankr. D. Del. 2003) ("even if there is no equity, a debtor need only establish though *prima facie* evidence that the collateral will likely play a significant role in the reorganization.") (citation omitted).  See also In re Dupell, 235 B.R. 783, 795 (Bankr. E.D. Pa. 1999) (refusing to lift the stay and allowing the debtor a chance to file and pursue a plan of reorganization despite there being no equity in the property).  Third, the Debtor adequately explained at the August Hearing how the marketing and sale of the Property is feasible.  Given the extensive amount of planning work that has already been done with regard to the Property, and the fact that the cost of approvals will be paid by a prospective developer, the Court concludes that the Debtor's Plan to market and sell the Property within a year - despite the fact that he currently has no equity in the Property - is in fact feasible.[15]

---

[15]  While the Motion did not seek adequate protection and this subject was not dealt with at any length at the August Hearing, the Court notes that lack of adequate protection can, under certain conditions, be a basis for lifting the stay.  See 11 U.S.C. § 362(d)(1), (noting that the stay may be lifted "for cause, including the lack of adequate protection of an interest in property").  It is not disputed that Mr. Ripley is not currently making payments to BOA on his loans.  However, adequate protection may be provided in a variety of ways, including by the creation of a "viable plan of reorganization which meets the debtor's statutory obligations to the
(continued...)

# V.  CONCLUSION

For reasons discussed above, the Court concludes that it is premature and

unwarranted to lift the automatic stay pursuant to 11 U.S.C. § 362(d)(2) at this

time.  Therefore, the Motion is denied.  While the Debtor lacks equity in the

Property, the land is necessary for an effective reorganization.  The Debtor has

presented the Court with a plan of reorganization which the Court deems to be

viable.  It is reasonable to propose that the Property can be marketed and sold

within approximately one year.


Dated: October 16, 2008      _____

JEAN K. FITZSIMON
United States Bankruptcy Judge

---

[15]  (...continued)
secured creditor."  In re American Sweeteners, Inc., 1999 WL 1068446, at *2 (Bankr. E.D. Pa.
Nov. 22, 1999) (citation omitted).  See also In re Dupell, 235 B.R. 783, 789 n.10 (E.D. Pa.
1990) (citation omitted).  Thus, because the issue of adequate protection has not been properly
raised by BOA and because the Debtor appears to be providing the Bank adequate protection
by having proposed a viable plan of reorganization, the Court will not order an additional
hearing to be held on adequate protection at this time.